IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

WILLIE STRAWDER, JR.,

            Plaintiff,

vs.                                                    CASE NO. 1:10-cv-68-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

            Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying his applications for a period of disability,

disability insurance benefits, and supplemental security income benefits.  (Doc. 1.)  The

Commissioner has answered (Doc. 12), and both parties have filed briefs outlining their

respective positions.  (Docs. 16 and 22.)  For the reasons discussed below, the

Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for disability insurance benefits under Title

II and supplemental security income under Title XVI of the Social Security Act (the

"Act") on July 24, 2006 alleging a disability onset date of October 1, 2005.  (R. 100-04,

105-07.)  Plaintiff's applications were denied initially on February 7, 2007 and upon

reconsideration on June 5, 2007.  (R. 45-46, 49-50, 61-65.)  On August 5, 2007 Plaintiff

filed a timely request for an administrative hearing.  (R. 72-73.)  Plaintiff appeared and

testified at an administrative hearing that was held on June 2, 2009.  (R. 19-44.)  On

September 2, 2009 the Administrative Law Judge ("ALJ") issued a written decision

concluding that Plaintiff was not disabled and thus was not entitled to a period of

disability insurance benefits or supplemental security income.  (R. 7-18.)  On October

29, 2009 Plaintiff timely filed a request for review of the ALJ's decision by the Appeals

Council. The Appeals Council denied Plaintiff's request for review on February 22,

2010.  (R. 1-6.)  Plaintiff then filed his Complaint in this case on April 19, 2010.  (R. 1-3;

Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does

---

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[10]  Third, if a claimant's impairments

meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

disabled.[11]  Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled.[12]  Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[15]  The Commissioner may satisfy this burden

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive

determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD

Given the issues presented in this case, the Court will focus upon the record evidence dealing with the Plaintiff's IQ and secondly upon the record evidence dealing with Plaintiff's adaptive functioning and activities of daily living.

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

## A.   Personal Background

Plaintiff born on February 6, 1976, was 33 years old on the date of his June 2, 2009 administrative hearing.  (R. 23.)  Plaintiff graduated from high school with a special education diploma and has past work experience as a car wash attendant, janitor, and surveyor helper.  (R. 24, 33-35.)

## B.   Evidence Considered By the ALJ

The evidence considered by the ALJ consisted primarily of Plaintiff's school records and the mental residual functional capacity assessments and mental status assessments of Plaintiff completed by several psychologists

### 1.   IQ Scores and Academic Functioning

Plaintiff was given a series of tests in May 1992 at the age of 16 when he was in the ninth grade at Gainesville High School as a routine reevaluation for his receipt of services in the Specific Learning Disability Program.  (R. 195, 206.)  He was given a Kaufman Assessment Battery for Children, (K-ABC); a Woodcock-Johnson-Revised test; and a Developmental Test of Visual-Motor Integration.  (*Id.*)  Plaintiff's Mental Processing Composite score of 81 on the K-ABC placed his "overall intellectual ability within the low-average range." (*Id.*)  His Sequential Processing score of 71 fell within the borderline range, while his Simultaneous Processing score of 93 fell within the average range.  (*Id.*)  Plaintiff's academic testing on the Woodcock-Johnson-Revised test placed Plaintiff's grade equivalent in Broad Reading as 1.9, while it was 2.2 in Broad Math, 1.6 in Broad Written Language and 1.5 in Spelling.  (*Id.*)  With respect to the Woodcock-Johnson-Revised test results the report disclosed that "[a]ll areas

considered yielded scores below the expected range when comparison is made with the overall ability score and Willie's age." (*Id.*)

The record also contains a number of Plaintiff's school records. (R. 195-207.) Plaintiff graduated from high school in June 1995 with a special education diploma. (R. 202.) His grades were mostly in the C and D range. (R. 196-98, 202.) The school records also include several of Plaintiff's Individual Education Plans. (R. 199, 205.) These records reflect that Plaintiff was diagnosed with specific learning disabilities and that Plaintiff received a number of implementations in order to assist him in school. (*Id.*)

### 2.   Mental RFC Assessments and Mental Status Examinations

Plaintiff underwent several physical mental RFC assessments and a mental status examination, the results of which are in the record.

Dr. Linda Abeles, Ph.D. conducted a mental status examination of Plaintiff and completed a report, dated January 31, 2007. (R. 228.) Plaintiff reported to Dr. Abeles that he had left his custodian position with the School Board of Alachua County because "he did not earn enough." Dr. Abeles's report contains Plaintiff's statement that "I'm not going to flush toilets all day" as support for Dr. Abeles' conclusion "that he believes he cannot obtain a desirable position and thus is 'not going to push myself.'" (R. 229.) Dr. Abeles opined that Plaintiff was "functioning in the Borderline to Mild Range of Mental Retardation." (*Id.*)

Dr. Abeles's conclusion was that Plaintiff appeared "to be suffering from traits of an Antisocial Personality Disorder as well as possible Mental Retardation." (R. 230.) Dr. Abeles noted that Plaintiff "reports being unwilling to work at a low-paying position"

and opined that his level of functioning would prevent Plaintiff from managing his own funds. (R. 230.) She stated that "[b]efore any final determination is made regarding the Claimant's disability status, it is recommended that he be referred for an intellectual evaluation" and that his "[p]rognosis for future success in the workplace, given the Claimant's current presentation is considered fair at best." (*Id.*)

Michael Zelenka, Ph.D. completed a Psychiatric Review Technique assessment of Plaintiff that was dated February 3, 2007. (R. 209-22.) Dr. Zelenka opined that Plaintiff had no restrictions in his activities of daily living, no difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 219.) He stated that Plaintiff had an organic mental disorder and had a medically determinable impairment that did not satisfy the diagnostic criteria, specifically a learning disorder and probable borderline intellectual functioning. (R. 233.)

Dr. Zelenka also completed a Mental Residual Functional Capacity Assessment. He noted that Plaintiff has a severe learning impairment and that Plaintiff's activities of daily living and work history indicated that he is functioning in the borderline range of intelligence but that Plaintiff is still able to drive, cook and perform all household chores. (R. 225.) He concluded that Plaintiff retained adequate mental ability to carry out simple instructions and to relate adequately to others in a routine work setting. (R. 225.) Dr. Zelenka concluded that Plaintiff had moderate limitations in (i) the ability to understand, remember and carry out detailed instructions, (ii) the ability to maintain attention and concentration for extended periods, and (iii) the ability to set realistic goals or make plans independently of others. (R. 223-24.)

Steven Wise, Psy.D. completed a Psychiatric Review Technique form dated May 29, 2007. Dr. Wise also opined that Plaintiff had an organic mental disorder. (R. 232-45.) He concluded that Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 242.) Dr. Wise noted that Plaintiff had a history of low average intelligence in school with achievement deficits and that Plaintiff was unwilling to work at a low paying position. (R. 244.)

Dr. Wise also completed a Mental Residual Functional Capacity Assessment. (R. 246-49.) He concluded that Plaintiff had moderate limitations in (i) the ability to understand and remember detailed instructions, (ii) the ability to carry out detailed instructions, (iii) the ability to accept instructions and respond appropriately to criticism from supervisors, and (iv) the ability to set realistic goals or make plans independently of others. (R. 246-47.) With respect to Plaintiff's mental RFC, Dr. Wise opined that Plaintiff was capable of (i) performing his past work, (ii) understanding and remembering basic tasks, (ii) carrying out simple tasks, (iii) maintaining concentration and attention for two hour periods during an eight hour work day, (iv) completing a normal workweek without excessive interruptions from psychologically based symptoms, (v) relating to supervisors, (vi) adapting to simple changes and (vii) avoiding work hazards. (R. 248.)

## C.   Hearing Testimony

At the administrative hearing Plaintiff testified he graduated from high school but he was in special education classes in which he received one-on-one help. (R. 24.) He

9

testified he has problems reading and writing and he can read traffic lights but not street signs.  (*Id.*)  Plaintiff stated he cannot read newspapers and has trouble at the store because he cannot tell whether he has been given the correct change.  (R. 24, 29.) Plaintiff has a drivers license, and testified he was able to pass the driving test with the assistance of his special education teacher.  (*Id.*)  Plaintiff does not have his own checking account, but he does have a savings account, although there is no money in his savings account.  (R. 24-25.)

With respect to his past work experience, Plaintiff testified he worked for years as a custodian at a school.  (R. 25.)  He cleaned bathrooms, but did not perform any repairs.  (R. 26-27.)  He obtained the job through the assistance of some of his former teachers.  (R. 32.)  Although Plaintiff testified he had to mix chemicals and set alarms as part of his job duties, because the janitorial staff would work in pairs, his partner would mix the chemicals and set the alarms for Plaintiff.  (R. 25-26.)  Plaintiff also previously worked as a car wash attendant.  (R. 27.)  As a car wash attendant Plaintiff washed, vacuumed, dried and waxed cars.  (*Id.*)  Plaintiff testified he had problems reading the different items on the tickets at the car wash and had to seek the assistance of a friend and co-worker to read the tickets.  (R. 27-28.)

Plaintiff also testified he briefly worked in a surveying position but was fired because he could not perform the significant reading and math involved in the job.  (R. 28.)  As a surveyor Plaintiff was required to read blueprints and then place stakes on the ground in the corresponding points.  Plaintiff stated that because he was unable to read the blueprints he would put the stakes in the wrong places.  (R. 34.)

Plaintiff testified he has always resided with his mother.   He was living with her

at the time of the administrative hearing. (R. 25.) Plaintiff testified his daily activities include: working around the house and running errands to the grocery store. (R. 28-29.) His nephew accompanies him on any trips to the store to make sure he receives the correct change because Plaintiff has trouble keeping the money straight. (R. 29, 30.) Plaintiff helps his mother by mopping the floors, blowing off the patio, taking out the trash and power washing the house. (R. 29.) He also testified he performs yard work for neighbors, moves things for others and goes fishing with his friends. (R. 30.) Plaintiff has no trouble driving, but he does have problems riding the bus because he cannot read the bus schedule. (R. 29.)

Plaintiff testified he tends to get stressed-out because he is unable to do the things he wants to with his life. (R. 31.) As a specific example, Plaintiff noted that he liked the surveying job, but frequently became upset while performing the surveyors job because his coworkers would act mean towards him when he was unable to do what was required of him. (R. 31.)

Robert C. Bradley, a Vocational Expert ("VE"), testified at the hearing. (R. 32.) He noted that Plaintiff's past relevant work consisted of the positions of car wash attendant, janitor and surveyor helper. (R. 33-35.) The ALJ posed a hypothetical to the VE, with the following profile: an individual who is Plaintiff's age, illiterate, has no exertional limitations but can only perform work that is simple and repetitive in nature, does not require reading, writing or math, and that also involves only occasional change in the work setting, occasional judgment and occasional interaction with the public. (R. 36.) The VE testified that there are jobs in the national economy at the unskilled level that such an individual could perform. (*Id.*) As examples of the jobs that such a

hypothetical individual could perform, the VE testified that the positions of dishwasher, dining room attendant, hand packager, cleaner, production assembler, housekeeper, and ticket taker could be performed. (R. 37-39.) The VE also testified that the hypothetical individual could not perform Plaintiff's past relevant work as a car wash attendant as that position is customarily performed in the national economy due to the need to read tickets. (R. 37.) He further testified, however, that such a hypothetical individual could perform the car wash attendant position as Plaintiff had performed it. (*Id.*) The VE also further testified that the hypothetical individual could also perform the janitor position as Plaintiff had performed it, but not as that position is customarily performed in the national economy. (*Id.*)

### D.    **Findings of the ALJ**

In her decision the ALJ concluded that Plaintiff had the severe impairments of borderline intellectual functioning and a learning disability. (R. 12.) She further concluded Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings. (*Id.*) The ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels but that Plaintiff possessed the nonexertional limitations of being limited to the performance of "simple routine tasks and activities that do not require reading, writing, or math are limited to occasional interaction with the public." (R. 14.) The ALJ concluded that Plaintiff was capable of performing his past relevant work as a custodian. (R. 16.) She further noted that this position did not require the performance of work-related activities that would be precluded by Plaintiff's RFC. (*Id.*)

12

The ALJ, however did not stop her analysis at step four but instead went on and made an alternative finding at Step Five of the sequential evaluation. The ALJ concluded that considering Plaintiff's age, work experience, and RFC, there are jobs existing in significant numbers in the national economy Plaintiff could perform. (R. 17.) The ALJ noted the VE had testified that "given all of these factors the individual would be able to perform the requirements of representative unskilled occupations such as hand packager, dining room attendant, cleaner, dishwasher and housekeeper," which the VE testified existed in significant numbers in the national economy. (R. 17-18.) The ALJ therefore concluded Plaintiff was not under a disability from October 1, 2005, the alleged disability onset date, through September 2, 2009, the date of her written decision. (*Id.*)

## IV. **DISCUSSION**

Plaintiff argues that the ALJ failed to fully and fairly develop the record by refusing to order a further consultative examination and I.Q. test of Plaintiff, the failure of which impacted Plaintiff's ability to meet the requirements of Listing 12.05C. Although the I.Q. test results from a previously performed K-ABC were higher than the requirements to meet Listing 1205C, Plaintiff argues that the K-ABC produces I.Q. results about 10 points higher than the WISC-R and therefore further testing was required.

Plaintiff's argument falls short for two primary reasons. First, the K-ABC is one of the standardized, individually administered intelligence tests typically used to determine

13

a person's I.Q.[21]  Secondly, even assuming there was some problem with using the K-ABC, Plaintiff still would not have met Listing 1205C because in addition to the I.Q. score Plaintiff must produce evidence of a physical or other mental impairment imposing an additional and significant work-related limitation or function." Plaintiff was unable to do so.

There is no question "[t]hat the ALJ has a basic duty to develop a full and fair record."[22]  As a Social Security administrative hearing is non-adversarial in nature,[23] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[24]  An ALJ, however, "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."[25]  In the end, however, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."[26]

---

[21] The DSM-IV provides that "General intellectual functioning is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests (e.g., Wechsler Intelligence Scales for Children, 3rd Edition; Stanford-Binet, 4th Edition; Kaufman Assessment Battery for Children)." Diagnostic and Statistical Manual of Mental Disorders at 42.

[22]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003);  20 C.F.R. § 416.912(d) ("Before we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").

[23] Id.

[24] See Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003).

[25] Ingram v. Comm'r Social Secur. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007); see also Outlaw v. Barnhart, 197 Fed. Appx. 825, 828 (11th Cir. 2006)(per curiam)(noting that "the ALJ may order a physical or mental examination of a claimant at the government's expense; but the ALJ is not required to order an examination if it is not necessary to enable the ALJ to make a disability determination.").

[26] Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

14

In this case, Plaintiff had a Kaufman Assessment Battery for Children (K-ABC) test performed in May 1992 when he was 16 years of age, the results of which are in the record. (R. 195.) Plaintiff's Mental Processing Composite score of 81 on the K-ABC placed his "overall intellectual ability within the low-average range." (*Id.*) His Sequential Processing score of 71 fell within the borderline range, while his Simultaneous Processing score of 93 fell within the average range. (*Id.*) Each of these results are insufficient on their face to satisfy the diagnostic requirements of listing 1205C.

Recognizing that the test scores are not nearly low enough to meet the listing, Plaintiff contends "[i]t has been known for over 25 years that the Kaufman Assessment Battery for Children (K-ABC) produces I.Q. results about 10 points higher than the normally used Wechsler Intelligence Scale for Children." (Doc. 16 p. 7.)[27] From this premise Plaintiff surmises that because Plaintiff's Woodcock-Johnson-Revised results from May 1992, reflected Plaintiff's academic functioning at the age of 16 was at the first or second grade level in every category, or the rough equivalent of the functioning of a 6 or 7 year old, Plaintiff's I.Q. really was closer to 50. (*Id.* pp. 7-8.)

Plaintiff's argument ignores that the fact the <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>") expressly identifies the K-ABC as one of the standardized,

---

[27] As support for his suggestion that the K-ABC produces higher I.Q. scores, Plaintiff cites a 1984 study of 35 Navajo children, the findings of which were published in the Journal of School Psychology, Volume 22, Issue 4, Winter 1984, pp. 373-79, "Assessment Battery for Children with a Navajo sample," by Jack A. Naglier, Ohio State University.

individually administered intelligence tests typically used to determine a person's I.Q.[28]
Accordingly, because the K-ABC is a recognized test typically used to determine I.Q.
and Plaintiff was administered the test at the age of 16, it was not essential or even
necessary for the ALJ to order a consultative WAIS-III, as Plaintiff's counsel had
requested.

Moreover, the fact that the I.Q. test was administered when Plaintiff was only
sixteen years of age has no bearing upon whether a further test should have been
obtained to reflect the current I.Q. because it is unlikely Plaintiff's I.Q. would change
materially as I.Q. generally remains constant throughout one's life.[29]  The premise that
I.Q. remains constant is a principle recognized by the Eleventh Circuit. The Eleventh
Circuit has held that "absent evidence of sudden trauma that can cause sudden
retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ
throughout [the claimant's] life."[30]  This stands to reason because mental retardation is
not an impairment which improves or gets better but rather "remains constant
throughout life."[31]  Because there is no evidence (or argument) in this case that Plaintiff
suffered any trauma which caused his I.Q. to decrease from the his I.Q. score at age 16
there was simply no reason for the ALJ to order another (and different) I.Q. test.

---

[28] The <u>DSM-IV</u> provides in relevant part that "General intellectual functioning is defined by the
intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized,
individually administered intelligence tests (e.g., Wechsler Intelligence Scales for Children, 3rd Edition;
Stanford-Binet, 4th Edition; Kaufman Assessment Battery for Children)." <u>Diagnostic and Statistical Manual
of Mental Disorders</u> at 42.

[29] The <u>DSM-IV</u> states that "cognitive IQ ... tends to remain a more stable attribute."  <u>Id.</u>

[30] <u>Hodges v Barnhart</u>, 276 F.3d 1265, 1268-69 (11th Cir. 2001).

[31] <u>Black v. Astrue</u>, 678 F. Supp. 2d 1250, 1257 (N.D. Fla. 2010).

Even assuming, however, that the ALJ should have ordered another I.Q. test, it would not have made any difference with regard to meeting Listing 1205C because there was no evidence that Plaintiff met the requirements of the Listing in addition to the diagnostic test scores.

Unlike other mental disorders, the listing for mental retardation in Listing 12.05C requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[32]  In determining whether a claimant has "[met] a listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings. . . ."[33]  Pursuant to 20 C.F.R. 404.1525(c), the introductory portion of each Listing defines or explains key specific medical findings which may be required to establish a diagnosis or confirm the existence of the impairment in order to meet the Listing.  Under Listing 12.05, an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[34]  The definition of mental retardation in the DSM-IV

---

[32]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  However, where as here, the Plaintiff had intelligence testing performed, those tests must substantiate a diagnosis of mental retardation.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[33]  Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002).

[34]  Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2)

17

parallels the definition in the Listing.[35]  General intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[36]

In addition to the diagnosis of mental retardation Listing 12.05C requires that the claimant must have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function."[37]   As such, IQ alone is not enough to determine mental retardation, as "[i]mpairments in adaptive functioning, rather than low IQ, are usually the presenting symptoms in individuals with Mental Retardation."[38]  While the IQ often remains stable, adaptive function can improve with training,[39] and therefore a valid IQ score is not enough to determine if someone is mentally retarded.[40]  For example, "mental retardation would not be diagnosed in an individual with an IQ lower than 70 if

---

have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[35] "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV at 40.

[36] DSM-IV at 42.

[37]  20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

[38]  DSM-IV at 42.

[39] Id.

[40] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

there are no significant deficits or impairments in adaptive functioning."[41]  Thus, in addition to a qualifying I.Q. score Plaintiff must also demonstrate that he possessed "a physical or other mental impairment imposing an additional and significant work-related limitation of function."[42]

The ALJ in this case properly concluded that Plaintiff did not meet the criteria of paragraph C of Listing 12.05, independent of his I.Q. score.[43]  In that regard the ALJ noted that "the evidence fails to establish the presence of the 'paragraph C' criteria" and "[t]he record does not contain evidence to support the presence of the 'C' criteria."  (R. 13.)

Further, In making her determination that another I.Q. test was not required the ALJ noted the level of functioning reflected in the record did not support such a request. For example, in addressing whether Plaintiff met Listing 12.05B, the ALJ found that Plaintiff has mild restriction in his activities of daily living, noting that Plaintiff can drive, perform all household tasks, and perform tasks like raking leaves, repairing cars and moving furniture for neighbors.  With respect to social functioning, the ALJ noted that Plaintiff only has mild difficulties, has a girlfriend, goes fishing with his friends, spends time on the weekends with his son and exhibited appropriate responses to the questions and had no difficulty interacting with others at the hearing.

---

[41] See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.")(citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

[42] 20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

[43] Plaintiff's I.Q. score from the K-ABC performed in May 1992 did not satisfy the requirement that his I.Q. be between 60 and 70 in order to meet Listing 12.05C.  (R. 195.)

The ALJ's determination that Plaintiff did not meet the requirements of Listing 12.05C also is supported by the non-examining state agency psychologists – Drs. Zelenka and Wise – who concluded that Plaintiff did not satisfy the requirements of Listing 12.05C.  (R. 211, 236.)

Plaintiff did not present any evidence suggesting he had adaptive functioning difficulties nor does the record reflect Plaintiff had the type of physical or mental impairment necessary meet the second requirement of Listing 12.05C.

While Plaintiff testified at the administrative hearing that he could not read or write he, nonetheless, was able to work successfully as a janitor for the School Board of Alachua County for years, only quitting because, as he stated to Dr. Abeles, he was "not going to flush toilets all day" and he was "unwilling to work at a low-paying position."  (R. 15, 229.)

Plaintiff further testified at the administrative hearing that he was able to help his mother perform all manner of household chores, move furniture and rake yards for neighbors as well as go fishing with his friends, maintain a relationship with a girlfriend and spend time with his sons on the weekend.  (R. 28-30.)  In short, the evidence does not demonstrate that Plaintiff exhibited any sort of additional physical or mental impairment which would impose an additional and significant work-related limitation of function or any shortcomings in adaptive functioning which are necessary to meet the requirements for Listing 12.05C.  The ALJ, therefore, correctly concluded that Plaintiff did not meet Listing 1205C. The ALJ was not required to order another or different I.Q. test because the I.Q. test of record is a recognized test used to gauge I.Q. – and even if it was not – a further I.Q. test would not make any difference because Plaintiff did not

satisfy the other criteria of Listing 1205C.

In sum, the ALJ did not err by failing to develop the record and therefore the decision of the Commissioner is due to be **AFFIRMED**.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on August 8, 2011.

*s / Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**